**In re Tad M. BALLANTYNE, Debtor.**

**Ronald SCHAEFER, Plaintiff,**

v.

**Tad M. BALLANTYNE, Defendant.**

**Bankruptcy No. 93–23210.**
**Adv. No. 93–2149.**

United States Bankruptcy Court,
E.D. Wisconsin.

March 16, 1994.

Raymond Burczyk, Burczyk & Burczyk, Racine, WI, for Ronald Schaefer.

Jonathan H. Dudley, for Tad M. Ballantyne.

### DECISION

DALE E. IHLENFELDT, Bankruptcy Judge.

In this adversary proceeding, the plaintiff, Ronald A. Schaefer, seeks a determination that the debtor, Tad M. Ballantyne, is indebted to him in the amount of $527,577 and that, pursuant to §§ 523(a)(2), (4) and (6) of the Bankruptcy Code, such debt is nondischargeable. In addition, Schaefer asks that Ballantyne be denied a discharge, pursuant to §§ 727(a)(2)(A) and (B) and §§ 727(a)(3) and (4)(A). The defendant, Ballantyne, has filed a motion for summary judgment asking that the proceeding be dismissed with prejudice. This court has jurisdiction under 28 U.S.C. § 1334(b); this is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

The § 727 provisions cited by Schaefer are contained in Subchapter II of chapter 7, and pursuant to § 103(b) of the Code, Subchapter II of chapter 7 is only applicable to a case under chapter 7. Since this is a case under chapter 11 of the Bankruptcy Code, plain-

tiff's allegations regarding § 727 will be dismissed.

For an understanding of this adversary proceeding's status within the context of the chapter 11 case and its impact upon the chapter 11 process, some knowledge of the history of the chapter 11 case is needed. An involuntary case was commenced against Ballantyne on May 15, 1992. The proceedings were delayed for some time by agreement between Ballantyne and the petitioning creditors, but on November 17, 1992, an order for relief was entered.

Ballantyne faced a number of problems, first and foremost among them a state court fraud action wherein the plaintiffs were seeking $2 million in actual damages and $3 million in punitive damages. The automatic stay was lifted, and the case was tried before a state court jury in January 1993. Ballantyne was successful in his defense against the law suit, the end result being that the action was dismissed on the merits with costs. This result enabled Ballantyne to enter into serious negotiations, and to obtain agreement, with various secured and unsecured creditors regarding the treatment to be accorded their claims in a plan of arrangement. A major exception to this was the claim asserted by Schaefer.

While it was not disputed that Schaefer had a claim against Ballantyne, the amount of such claim was very much in dispute. Having in mind § 502(c)(1) [1] of the Code, and in order to move the chapter 11 proceedings along, the court scheduled a hearing for the purpose of estimating the amount of Schaefer's claim. Schaefer had not yet filed a proof of claim (and to this date has not done so), but no bar date for filing claims had been set, and the court ruled that it would treat the complaint in this adversary proceeding as an informal proof of claim. A hearing was held on October 13, 1993, and on October 28, 1993, the court filed its memorandum decision and order, wherein it estimated Schaefer's unliquidated and contingent claim to be in the amount of $123,000. Ballantyne has since filed a motion asking the court to reconsider its decision.

Upon reflection, the court realized Schaefer's nondischargeability proceeding would have to be decided before there could be any meaningful vote on Ballantyne's plan. In this individual chapter 11 case, in order for creditors to fairly evaluate Ballantyne's future chances to successfully complete his plan and accordingly for them to vote intelligently on the plan, they would need to know not only the amount of the debt owed to Schaefer but also whether or not the debt would survive confirmation of the plan as a nondischargeable claim against Ballantyne. § 1141(d)(2). The court notified the parties that it would reconsider its order estimating the amount of Schaefer's claim and in addition would proceed to a disposition of Schaefer's adversary proceeding. At this juncture, Ballantyne filed his motion for summary judgment asking that Schaefer's complaint be dismissed with prejudice.

Summary judgment is appropriate when there is no genuine issue of material fact in dispute and the moving party should prevail as a matter of law. Under Federal Rule of Civil Procedure 56(c) (Rule 7056 of the Federal Rules of Bankruptcy Procedure), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any", which it believes demonstrate the absence of a genuine issue of material fact. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317,

---

**1.** § 502(c) There shall be estimated for purpose of allowance under this section—

(1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case;

323, 325, 106 S.Ct. 2548, 2553, 2554, 91 L.Ed.2d 265 (1986).

The primary purpose for granting summary judgment motions is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Wainwright Bank v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986). Once a motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. The plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. All inferences are taken in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–57, 106 S.Ct. 2505, 2513–15, 91 L.Ed.2d 202 (1986); *Price v. Rochford,* 947 F.2d 829, 832 (7th Cir.1991).

Ballantyne and Schaefer were involved in a number of so-called "Centsible" corporations. The first such venture, organized on June 1, 1988, was Centsible Enterprises, Inc. Schaefer invested $25,000 in Centsible Enterprises, Inc., and Ballantyne was to invest the same amount. Other corporations organized by Ballantyne followed, among them, Centsible Travel, Inc. and Centsible Limousine, Inc. Centsible Enterprises was the majority stockholder in Centsible Travel and Centsible Limousine. It was Centsible Travel, a travel agency, incorporated on January 5, 1989, that accumulated most of the debts for which Schaefer seeks to hold Ballantyne responsible.

The First Wisconsin Bank of Racine, now Firstar Bank Racine, N.A., provided financing for some of the corporate activities. When loans were obtained from the bank in 1989, personal guaranties from Ballantyne and Schaefer were required by the bank.[2] Subsequently, upon default of those loans, Schaefer's guaranty was called in by the bank, and Schaefer paid the bank substantial sums of money on his guaranty. A large

part of Schaefer's claim against Ballantyne is based upon Ballantyne's obligation to repay Schaefer for his share—one-half of Schaefer's payments—of this joint obligation.

In support of his motion for summary judgment, the defendant has filed a brief together with an affidavit of Ballantyne and attached documents, including portions of a transcript of a Schaefer deposition. In response, the plaintiff filed a brief along with portions of a transcript of a Ballantyne deposition. A hearing on defendant's motion and plaintiff's opposition thereto was held on February 16, 1994. The defendant's motion and the briefs and oral arguments of the parties were concerned for the most part with the issues of dischargeability. The dollar elements going to make up Schaefer's $527,577 claim were discussed only in general terms, if at all. Schaefer cites the following three subsections of § 523 as the statutory authority supporting the nondischargeability allegations of his complaint.

(1) *Ballantyne "obtained money and credit by false pretenses, false representations and/or actual fraud as defined in 11 U.S.C. 523(a)(2)(A)."*

■ To succeed on a claim that a debt is nondischargeable under § 523(a)(2)(A), a creditor must prove: (1) The debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. (2) The creditor must also prove that the debtor possessed scienter, i.e., an intent to deceive. (3) The creditor must show that he actually relied on the false representation. (4) The creditor must show that his reliance upon the false representation was reasonable. *In re Kimzey,* 761 F.2d 421 (7th Cir.1985). The creditor must prove the facts establishing each element by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ Exceptions to discharge are construed narrowly, and the burden of proving that a debt falls within the statutory excep-

---

**2.** As copies of Schaefer's guaranties are not included in the record, the date or dates of his guaranties is uncertain. Several of Ballantyne's guaranties attached to the bank's proof of claim

are dated February 10, 1989, March 3, 1989 and June 8, 1989. The court assumes that Schaefer's guaranties were given to the bank at or about those same times.

tion is on the party opposing discharge. For purposes of § 523(a)(2)(A), the timing of the fraud is critical. For example, the plaintiff must produce evidence on the state of mind of the debtor at the time of the alleged misrepresentations *In re Black*, 787 F.2d 503 (10th Cir.1986), and must prove that the debtor's fraud existed and occurred at the time the financing took place. Subsequent misrepresentations have no effect on the discharge. *In re Iaquinta*, 98 B.R. 919 (Bankr. N.D.IL 1989).

In reply to the court's question of what money or property did Schaefer obtain from Ballantyne by false representations, Schaefer's attorney cited two instances. He mentioned Schaefer's initial $25,000 investment in Centsible Enterprises and then responded affirmatively to the court's suggestion that Schaefer's guaranty of the joint debt to the bank might also qualify. He said that Schaefer was at all times an investor, not a lender, and that he had not loaned money to, and was not asserting a claim as a creditor of, Ballantyne or any of the corporations. So far as the court is aware, there is no claim that Ballantyne obtained money or credit by fraud or false representations from Schaefer at any time other than the two occasions mentioned above.[3]

■ The record indicates in a number of places that Schaefer gave his initial $25,000 investment to Ballantyne on or about June 1, 1988. Schaefer says Ballantyne told him that the money would be invested in a corporation that would be formed and known as Centsible Enterprises. Schaefer has not claimed that the money was not so invested. The gist of his complaint is that Ballantyne obtained the $25,000 investment by misrepresenting his "financial, corporate and business interests, and financial net worth." [¶ 1] The complaint also charges [¶ 2(a)(1) and (2) ] that Ballantyne "had on a substantial number of occasions stated to plaintiff and to plaintiff's father and others that he had a substantial interest in a business called Racine Steel Castings and that it had a very substantial value and in which he was anticipating to

divest his interest and to use the proceeds to invest in other business ventures" and "as an inducement to plaintiff to enter into a business arrangement, the defendant represented and warranted that the total amount of his net worth was substantially in excess of $1,000,000.00."

The complaint alleges further [¶ 2(a)13] that Ballantyne "knew the representations were false at the times they were made to Plaintiff and were made with the intent to deceive Plaintiff who relied upon said statements. That by reason of these actions and statements Defendant was able to deceive Plaintiff into entering the business arrangement and that Plaintiff sustained a substantial loss as a result of his reliance on the representations made to him."

The complaint fails to specify any particular time and place when Ballantyne made these representations to Schaefer for the purpose of obtaining the $25,000 investment. References [¶¶ 2(a)8, 9 and 11] to later years are of course irrelevant. Schaefer himself could not recall when the representations were made. Asked about this [Deposition, p. 14], he said it had happened "Thousands of times" and in "a zillion places", but he could not produce any written documentation, and he could not recall any specific date or time or place where the representations were supposed to have been made in order to induce him to invest the $25,000.

Schaefer was never given a written statement by Ballantyne respecting the latter's financial condition or net worth. See § 523(a)(2)(B). The complaint mentions allegedly false financial statements [¶ 2(a)8] but states they were given in 1989 and 1991, long after the $25,000 investment, and then to persons other than Schaefer. Copies of such statements have not been presented, and it has not been shown in what respect they were false. Asked if he himself had received any financial statements, Schaefer testified [p. 39], "Well, I think verbally we did. Of course we did." Most of the alleged statements made by Ballantyne to induce Schaefer to part with his $25,000 investment

**3.** There is brief mention of a joint "liability to indemnify [a] bonding agency" in paragraph 2(b)1 on pages 6 and 7 of the complaint. The

court found no mention of what induced Schaefer to sign it.

were essentially statements concerning Ballantyne's financial condition. Oral statements regarding the debtor's financial condition are not encompassed in § 523(a)(2)(A) of the Code. *Blackwell v. Dabney,* 702 F.2d 490 (4th Cir.1983).

The problem with the joint guaranty or guaranties signed by Schaefer is the same. Although the rather lengthy complaint describes a series of events occurring over a period of several years, it does not specify any particular occasion when Ballantyne made representations to Schaefer, or even that such representations were made, for the purpose of persuading him to sign the joint guaranty. In fact, the record does not reveal exactly when Schaefer signed the guaranties.

(2) Schaefer's *"claim against debtor is nondischargeable under Sec. 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."*

### Fraud or defalcation while acting in a fiduciary capacity

To prevail under this exception to discharge, the plaintiff must establish first that a fiduciary relationship existed between the parties, and then that fraud or defalcation has occurred in the course of the debtor's fiduciary capacity. The courts have consistently held that "fiduciary capacity" should be construed narrowly for bankruptcy dischargeability purposes, and that it is intended to refer only to "express" or "technical" trusts. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In re Johnson,* 691 F.2d 249 (6th Cir.1982). In deciding the question, the court looks to the substance of the parties' relationship. There must have been a trust relationship in existence between the parties prior to the act of wrongdoing out of which. the debt arose. *In re Pedrazzini,* 644 F.2d 756, 758 (9th Cir.1981). Parties, however, cannot create a fiduciary relationship for purposes of discharge determination merely by inserting trust or fiduciary language in the agreement. *Judd v. First Fed. Sav. & Loan Assn.,* 710 F.2d 1237, 1241 (7th Cir.1983).

"Fiduciary capacity" has been given this narrow interpretation because of the broad meaning given to the term "defalcation." Defalcation by one acting in a fiduciary capacity is "broader than 'embezzlement' and probably broader than 'misappropriation'." 3 *Collier on Bankruptcy,* p. 523–103 (15th ed. 1993). If "fiduciary capacity" were expanded to include ordinary agency or partnership relationships, it would be difficult to limit its application. As stated in *In re Holman,* 42 B.R. 848, 850 (Bankr.E.D.MO 1984),

> The reason why courts construed the term "fiduciary" so narrowly was because the term "defalcation", unlike fraud, was construed to include not only conduct involving bad faith or intentional wrong doing but also the mere failure to account for funds entrusted to the fiduciary.

"Unfortunately, the Supreme Court has not spoken on this issue since the *Davis* case, leaving the lower courts to struggle with the concept of 'express' or 'technical' trusts." *Quaif v. Johnson,* 4 F.3d 950, 953 (11th Cir.1993). While the "usual elements of an express trust traditionally have included an explicit declaration of trust, a clearly defined trust *res,* and an intent to create a trust relationship," *In re Janikowski,* 60 B.R. 784, 789 (Bankr.N.D.IL 1986), courts have found § 523(a)(4) trust relationships to exist "in situations that, while not involving trusts in a formal sense, seemed to call for the imposition of the same high standard." *In re Marchiando,* 13 F.3d 1111, 1115 (7th Cir.1994).

Section 17a(4) of the Bankruptcy Act of 1898 excepted from discharge debts created by "... misappropriation or defalcation while acting as an officer or in any fiducial capacity." Section 523(a)(4) of the Code, enacted in 1978, omits the word "officer", but "the omission is without significance because an officer who misappropriates funds of a corporation is acting in a fiduciary capacity, and despite deletion of the word 'officer,' the debt would be nondischargeable." 3 *Collier on Bankruptcy,* ¶ 523.14 at 523–102 n. 1. (15th ed. 1993).

The relationship to a corporation of its chief executive officer is not invariably a fiduciary relationship for purposes of § 523(a)(4) in all cases, *In re McKinney,* 151 B.R. 944, 24 B.C.D. 151 (Bankr.N.D.OK 1993), but it is clear that a corporate officer

has breached that sort of fiduciary relationship to a corporation when he misappropriates corporate property for his own benefit. *In re Touchstone,* 153 B.R. 955 (Bankr. S.D.FL 1993). The issue in the case at bar, however, is not whether that kind of fiduciary relationship existed between Ballantyne and the corporations, but whether it existed between Ballantyne and Schaefer, an investor.

■ Although the question of who is a fiduciary for purposes of § 523(a)(4) is one of federal law, and a state's statutory efforts to label the debtor a fiduciary may not make the debtor a fiduciary within the meaning of § 523(a)(4), *Marchiando,* 13 F.3d at 1117, state law is of importance in determining whether a trust relationship exists. *In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982).

A number of Wisconsin cases have dealt with the relationship between corporate officers and individual stockholders. In the early case of *Timme v. Kopmeier,* 162 Wis. 571, 575, 156 N.W. 961 (1916), the court said that directors of a corporation "occupy a position of trust and confidence and are considered in the law as standing in a fiduciary relation toward the stockholders and as trustees for them." They "are not permitted to use their position of trust and confidence to further their private interests."

In *McGivern v. Amasa Lumber Co.,* 77 Wis.2d 241, 260, 252 N.W.2d 371 (1977), a suit by a creditor against an officer/director, the court analogized the situation to the latter's duty to shareholders as follows:

Although Wisconsin law has long recognized that directors and officers owe a fiduciary duty to and are trustees for the individual shareholders (as well as the corporation), [citing *Grognet v. Fox Valley Trucking Service,* 45 Wis.2d 235, 172 N.W.2d 812 (1969) ] this court has said that where the breach of this duty constitutes a primary and direct injury to the corporation and only a secondary injury to shareholders, any remedial action by a shareholder must be taken for the benefit of the corporation; *the shareholder has no individual right of action.* [citing *Rose v. Schantz,* 56 Wis.2d 222, 229, 201 N.W.2d 593 (1972) ] It is only if a shareholder's *individual rights* are being violated that the shareholder can sue on his or her own behalf. (emphasis added)

\*　\*　\*　\*　\*　\*

McGivern was suing on her own behalf—not on behalf of Amasa or the creditors. Her cause of action against Meyer and Roethe for deceit in inducing her to remain a creditor of Amasa was personal to her, and was properly asserted in this case. However, her attempt to hold Meyer liable to her as a fiduciary must fail. McGivern claims that a general fiduciary obligation is owed by the directors and officers of a solvent corporation to each creditor personally. No such personal duty exists. The instructions requested by McGivern were not correct statements of the law applicable to the case and were properly refused by the trial court.

In the *Rose* case cited above, a suit by a stockholder against officers and directors of a corporation, the court said:

It is true the fiduciary duty of a director is owed to the individual stockholders as well as to the corporation. Directors in this state may not use their position of trust to further their private interests. Thus, where some *individual right of a stockholder* is being impaired by the improper acts of a director, the stockholder can bring a direct suit on his own behalf because it is his *individual right* that is being violated. (emphasis added)

However, it is also true in this state that: "Rights of action accruing to a corporation belong to the corporation, and an action at law or in equity, cannot be maintained by the members as individuals...."

So the question to be asked is, "Whose right is sought to be enforced by the alternative cause of action?" It appears to us that the only direct injury alleged is to the corporation. It is the corporation's funds that allegedly are to be used to pay off debts before due and to redeem stock. It is the corporation that allegedly will have its working capital impaired. It is the corporation that allegedly will no longer be able to stay in business. At least, the primary injury set forth is to the corpora-

tion, not the individual stockholder bringing the suit. *Id.* at p. 228–29 [201 N.W.2d 593].

The court went on to say that primary and direct injury to a corporation resulting from the wrongdoing, fraud or negligence of corporate officers may have a subsequent impact on the value of the stockholders' shares, but this secondary injury is not enough to create a right to bring a direct, rather than derivative, action. "A stockholder cannot, as an individual as distinguished from a representative of the corporation, sue directors or other corporate officers for mismanagement, negligence or the like, on a cause of action which belongs to the corporation." *Rose* at 229, n. 9, 201 N.W.2d 593.

The above described "fiduciary relationship" between directors and shareholders in Wisconsin arises solely from case law. The words "trust" and "fiduciary" do not appear in chapter 180 dealing with "Business Corporations" nor in chapter 776 dealing with "Actions against Corporations" of the Wisconsin statutes. The only statutory language that comes close is contained in "180.0828 Limited liability of directors", which speaks of "a wilful failure to deal fairly with the corporation or its shareholders in connection with a matter in which the director has a material conflict of interest" and "a transaction from which the director derived an improper personal profit", but makes no mention of a trust or fiduciary relationship.

### Embezzlement or larceny

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking." 3 *Collier on Bankruptcy,* p. 523–113. (15th ed. 1993). Although embezzlement and larceny do not require establishing the existence of a fiduciary relationship, the plaintiff must certainly show that it was the plaintiff's property that was embezzled or stolen. Absent such a showing, the plaintiff would not have standing to bring the action.

Schaefer's complaint alleges as follows with respect to § 523(a)(4):

1. Defendant was the chief operating officer of Centsible Travel and Centsible Limousine. As chief operating officer of Centsible Travel, defendant defalcated in the remittance of funds to travel carriers in the sum of $30,000.00. The defalcation was paid by Continental Insurance under the terms of a performance bond executed by plaintiff and defendant. Plaintiff is subject to personal liability to indemnify the bonding agency as a result of said defalcation.

2. There have been several checks issued by both corporations in substantial amounts and there is no record of billings or accounts payable to justify such disbursements.

3. Defendant permitted a non-officer to execute checks to himself totaling approximately $7,000.00 from Centisible Travel Inc. That no services were rendered by the non-officer to the corporation.

4. Defendant sold the travel business to Omega Travel of Washington D.C. and also sold the office equipment, computers and office furniture of Centsible Travel and has not accounted for monies received and believed to be in the sum of $25,000.00.

5. Defendant acted in a fiduciary capacity at all times in the operation of Centsible Travel and Limousine and at no time advised plaintiff of the disbursements which were out of the ordinary course of business.

As the foregoing language suggests, Schaefer's grievances have to do mostly with the manner in which Ballantyne ran these various businesses. He has also said that Ballantyne used the Centsible corporations as his "alter ego" and that he did things that would benefit him personally, but the great bulk of the material in Schaefer's complaint, his brief and his testimony charge Ballantyne with "mismanagement" and "poor business decisions." In any event, so far as the court is aware, Schaefer has at no time charged Ballantyne with embezzlement or larceny of any of Schaefer's property.

(3) Ballantyne *"wilfully and maliciously injured plaintiff as prescribed in 11 U.S.C. 523(a)(6)."*

 In order for a debt to be held nondischargeable under § 523(a)(6), the plaintiff must prove that plaintiff's injury resulted from an act that was both willful and malicious. The term "willful" means "deliberate or intentional," and "malicious" means "wrongful and without just cause or excuse even in the absence of personal hatred, spite or ill will." *In re Dorsey,* 162 B.R. 150 (Bankr.N.D.IL 1993).

Under this section, "conversion" of another's property can give rise to a nondischargeable obligation. 3 *Collier on Bankruptcy,* § 523.16 (15 ed. 1993). Schaefer alleges in ¶ 2(c)1 of the complaint that Ballantyne "wilfully and maliciously converted $25,000.00 given by plaintiff to defendant to invest in the business arrangement proposed by defendant." So far as the court is aware, there is nothing in the record to support this charge. Schaefer was told that the money would be invested in the Centsible Enterprises corporation, and it apparently was so invested.

At the hearing on defendant's motion for summary judgment, the court asked Schaefer's attorney, "What willful and malicious injury did the debtor do to Schaefer?" His answer was that Ballantyne's failure to keep corporate records, his mismanagement of corporate affairs and his use of the corporations for his personal benefit were done for the specific purpose of injuring Schaefer. Schaefer's accusations and examples of corporate mismanagement, in the opinion of the court, do not meet the "willful and malicious" requirements of § 523(a)(6). Furthermore, even assuming that Ballantyne was guilty of gross mismanagement, which he may have been, or worse, there is nothing in the record to suggest that his actions were intended to, or were done with the thought in mind that they would, harm Schaefer.

In addition to mismanagement and failing to keep proper records, Schaefer accused Ballantyne of using their business enterprises for his own personal benefit. In particular, he accused Ballantyne of issuing checks with no records to justify such disbursements, selling corporate property without accounting for the monies received, making payments out of the ordinary course of business, and he said that Ballantyne had withdrawn monies from Centsible Enterprises for his personal use.

 The lengthy complaint, the briefs of the parties, and the deposition questions and answers have placed a great many facts before the court. The sense that the court gets from this great mass of material is that Ballantyne and Schaefer invested in a business venture that lost money throughout its existence, that Ballantyne failed to keep and maintain proper corporate records, and that he shifted funds between the various enterprises and was accordingly guilty of mismanagement of the corporate affairs, perhaps gross mismanagement. However, there is no significant probative evidence tending to support the allegations of the complaint (¶ 2(a)12) that Ballantyne used the corporations for his own individual benefit.

Much of the Schaefer and Ballantyne depositions deal with various individual checks that were issued by Ballantyne in the course of operating the business. None of the checks were made out to Ballantyne, and the questions and answers contained in the depositions are not persuasive that he personally profited from any of them. Schaefer's testimony either shows a lack of knowledge of what happened or is based on hearsay. Ballantyne's affidavit lists the individual checks and the expenses which they went to pay, and states categorically that they "were appropriately remitted." His affidavit also states that the travel carrier funds (referred to in ¶ 2(b)1 of the complaint) and the monies obtained from the sale of the travel agency were paid to Firstar Bank on the secured loans (the loans which Schaefer had guaranteed).

Schaefer's complaint and brief complain that despite repeated requests, Ballantyne has failed to turn over various corporate records. Ballantyne in turn has responded that he does not have the records. Such requests have not been presented formally to the court, and the court is unable to find that the debtor has refused to produce documents

in his possession in order to deny Schaefer the opportunity to oppose the debtor's motion.

In summary, the court finds as follows:

(1) As to § 523(a)(2)(A), if in fact Ballantyne made false representations, the record does not indicate exactly when and where such representations were made, or that they were made to Schaefer for the purpose of inducing him to invest $25,000 in Centsible Enterprises, Inc. or inducing him to sign guaranties for the Racine bank loan.

(2) As to § 523(a)(4), there was not a fiduciary relationship between Ballantyne and Schaefer within the meaning of that subsection, and it has not been suggested or shown that Schaefer's property was embezzled or stolen.

(3) As to § 523(a)(6), there is nothing in the record to show, in regard to his alleged mismanagement of corporate affairs, that Ballantyne's actions were taken with intent to harm Schaefer or with the thought in mind that they would harm Schaefer.

This decision constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Bank. P. 7052. An order will be entered granting the motion of the defendant and dismissing this adversary proceeding.

### ORDER MODIFYING ESTIMATE OF RONALD SCHAEFER CLAIM

On October 28, 1993, the court filed its memorandum decision and order estimating the claim of Ronald Schaefer to be in the amount of $123,000. $56,000 of that amount represented one-half of $112,000. The $112,000 in turn was that portion of the claim of Firstar Bank of Wisconsin which the court understood to be the remaining unpaid joint obligation of the debtor, Tad M. Ballantyne and the claimant, Ronald Schaefer.

Since the October 28, 1993 order, the debtor has filed a motion for reconsideration and the claimant has filed an objection to the debtor's motion. The debtor's motion points out that an agreement between the bank and Schaefer has absolved Schaefer of any further liability to the bank on the above mentioned joint obligation. This statement is supported by an affidavit of Roy J. Josten,

attorney for the bank. Josten's affidavit states that by virtue of a settlement agreement between Schaefer and the bank, Schaefer has been relieved of any further liability on the joint guaranties.

The court is satisfied that there is no further liability by Schaefer on the joint guaranties, and that the $56,000 should be deleted from the amount of the claim as estimated by the court. Accordingly,

IT IS ORDERED that the court's order of October 28, 1993 is vacated and set aside.

IT IS FURTHER ORDERED that the claim of Ronald Schaefer is estimated to be in the amount of $67,000.

### ORDER DISMISSING ADVERSARY PROCEEDING

In this adversary proceeding, the plaintiff, Ronald A. Schaefer, seeks a determination that the debtor, Tad M. Ballantyne, is indebted to him in the amount of $527,577 and that, pursuant to §§ 523(a)(2), (4) and (6) of the Bankruptcy Code, such debt is nondischargeable. In addition, Schaefer asks that Ballantyne be denied a discharge, pursuant to §§ 727(a)(2)(A) and (B) and §§ 727(a)(3) and (4)(A). The defendant, Ballantyne, has filed a motion for summary judgment asking that the proceeding be dismissed with prejudice.

The court has this date filed its written decision finding in favor of the defendant's motion for summary judgment. Accordingly,

IT IS ORDERED that this adversary proceeding is hereby dismissed with prejudice.