In re Isaac **WILSON,** Debtor.

Gaile **BIGGERS,** Plaintiff,

v.

Isaac **WILSON,** Defendant.

Bankruptcy No. 96–29993–MDM.

Adversary No. 97–2094.

United States Bankruptcy Court, E.D. Wisconsin.

Nov. 25, 1997.

Mark J. Goldstein, Milwaukee, WI, for Plaintiff.

Burton B. Polansky, Milwaukee, WI, for Defendant.

## MEMORANDUM DECISION

M. DEE McGARITY, Bankruptcy Judge.

### I. INTRODUCTION

Plaintiff, Gaile Biggers, filed this adversary proceeding against defendant, Isaac Wilson, and sought to except from discharge under 11 U.S.C. § 523(a)(6) a judgment against the debtor for sexual discrimination and sexual harassment. Ms. Biggers subsequently moved for summary judgment on the grounds that the doctrine of collateral estoppel (issue preclusion) gave preclusive effect to the decision by the Equal Rights Division of the Wisconsin Department of Industry, Labor and Human Relations, which was upheld on appeal by the Labor and Industry Review Commission, the Milwaukee County Circuit Court and the Wisconsin Court of Appeals. Mr. Wilson opposed this motion.

This court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### II. FACTS

The defendant, Isaac Wilson, owns and manages Isaac's Lounge, a cocktail lounge located in the city of Milwaukee. Plaintiff, Gaile Biggers, was a bartender and assistant at Isaac's Lounge intermittently between 1983 and 1990. In December 1990, Mr. Wilson terminated Ms. Biggers' employment and

she subsequently filed a complaint with the Equal Rights Division of the Wisconsin Department of Industry, Labor and Human Relations against Isaac's Lounge, alleging sexual harassment. A hearing on the complaint was held before an Administrative Law Judge for the Equal Rights Division (ALJ). Mr. Wilson proceeded *pro se* and presented the testimony of nine witnesses to rebut the allegations made by Ms. Biggers.

The ALJ concluded that Mr. Wilson had subjected Ms. Biggers to sexual harassment because of her sex and terminated her employment because she resisted Mr. Wilson's sexual advances. Mr. Wilson petitioned the Wisconsin Labor and Industry Review Commission (LIRC) for review of the matter, and both parties submitted written arguments. The LIRC sustained the decision of the ALJ and made the following findings of facts:

1. The complainant, a female, first commenced employment with the respondent, a cocktail lounge, in August 1983. Isaac Wilson owns and manages the respondent. Complainant worked as a waitress and then became a bartender. The complainant quit, apparently sometime in 1984, because she felt the respondent was showing favoritism to a female employe she believed the respondent was having a relationship with, and because this female had made it appear that she (complainant) was responsible for stealing $100 that was missing.

2. Prior to her quitting in 1984 an incident occurred where the respondent started fondling the complainant and, when she tried to push him away, held her in a position such that she could not move and then put his hand under her dress and inside her pantyhose. This incident occurred one night in early 1984 when complainant needed a ride home after work and all the other employees had gone home. Complainant let the respondent know that she did not appreciate his actions and never said anything further about the incident in hopes that it would not happen again. Complainant continued to work for respondent after this incident because she needed the money.

3. Subsequent to 1984 the complainant returned to work for the respondent. It is not clear from the record as to when, or the circumstances under which the complainant returned to work. In any event, complainant described it as being really good to work for respondent around March 1988. Complainant testified that the respondent's whole disposition had changed; that respondent was going to church and was apparently a deacon.

4. Complainant became the head bartender and supervised other employees during her second period of employment with respondent. Complainant ended up quitting a second time, however, due to the difficulties that she encountered with a male bartender who refused to accept the fact that she was in charge, particularly when the respondent was away from the establishment. Complainant tendered her resignation when this male bartender refused to allow her to set up his cash register for the next night's business. At one point during this incident the male bartender closed her finger in the till and twisted her arm. This incident occurred no sooner than respondent had left on vacation despite specific instructions from the respondent before leaving that complainant had responsibility to set up the cash register. Complainant's quitting apparently occurred sometime in 1988.

5. Complainant began a third period of employment with the respondent in June 1990. Complainant had no intention of returning to work for the respondent. She returned to work for respondent, however, after being asked by respondent several times. Respondent told her he had no one he could trust to open and close the business, and that he was not pleased with the individual that was working as the head bartender. Complainant agreed to return to work as an assistant to the respondent, with duties which included opening and closing the business when

respondent was away and at other times when needed, but did not include supervising employees. Complainant testified that she agreed to return to work on the condition that the male bartender with whom she had previously encountered difficulties (i.e., one Kappfgrs Ward, a.k.a. "Mickey") would not be returning to work, and that respondent would not be contradicting or changing decisions that she had made. It was agreed she would be paid $7 per hour (plus tips). She averaged 15 to 20 hours of work each week with an average earning of $140 per week. About two months after complainant returned to work, the head bartender quit and those duties were then pushed onto her.

6. After June 1990, the respondent started asking complainant if she would let him go home with her. The respondent became especially persistent in asking to go home with her after her fiancé left for Saudi Arabia in September 1990. The respondent would ask if she was lonesome now that her fiancé was away, tell her how concerned he was about her and ask if she would let him go home with her. This caused complainant to become upset. Complainant would try to evade the respondent's statements, and at times would make suggestions that respondent get his wife more involved with the business and that respondent spend more time with his wife.

7. On November 11, 1990, a birthday party was held for the respondent. While working the bar, the respondent told the complainant that the present he wanted her to give him was that the respondent could go home with her to have sex. The respondent then grabbed her arm and stated, "Everytime I come by you or touch you my thing gets hard." The respondent asked complainant if she was going to let him go home with her to which she replied, "No." The respondent then asked complainant if she "thought because he was over 50 his thing could not get hard."

8. The respondent denied ever asking complainant if he could go home and have sex with her, including on the night of his birthday party.

9. The incident involving the respondent at his birthday party caused complainant to become very concerned since all she wanted from respondent was to be treated in a professional manner and for the respondent to respect her fiancé. As a result of this incident, complainant wrote a letter dated November 16, 1990, to respondent. (See [LIRC] Exh. No. 1) In the November 16 letter complainant told the respondent that she had no interest in sleeping with him, and about other concerns that she had involving her employment with respondent. After complainant gave respondent the letter, he got very upset, hollered at her and was cursing. Respondent asserts that he asked complainant why she wrote a letter like this, told her he was never interested in her, and, apparently, that the letter was unfounded. Respondent asserts that he let complainant know he was very unhappy with the letter because the contents were not true.

10. Apparently, about the same time of complainant's November 16 letter, complainant approached the respondent about no longer performing the head bartender duties, duties which she had not agreed to perform when agreeing to return to work in June 1990. Complainant told the respondent that she wanted to remain in the capacity of assistant, but did not want to continue as the head bartender with responsibility for the employees because respondent was showing favoritism to some of the employees, and because there had been times where there were things she had asked employees to do but the respondent would then go and tell them something different. The respondent brought up not paying her the same wage if she did not want to continue as the head bartender. Complainant explained to respondent that the head bartender

duties were not part of her agreement to return to work. It was complainant's intent to continue as assistant. There was no further discussion about this.

11. About two weeks later (apparently December 5, 1990), upon arriving at work the respondent informed complainant that he wanted to talk to her and took her into a back room. The respondent told complainant "I've been reading your letter over and over. And, so we can remain friends, I feel I can do the job myself." Complainant responded, "okay, Isaac," and went out to the bar to start getting her things together at which point respondent told her he had all of her things and threw them on the bar.

Labor and Industry Review Commission Findings of Fact, Conclusions of Law, Order & Memorandum Opinion, October 21, 1993, pp. 1–4. The Commission concluded that Ms. Biggers had proven by a preponderance of the evidence that Isaac's Lounge, her employer, discriminated against her in violation of Wisconsin's Fair Employment Act by subjecting her to sexual harassment because of her sex. The Commission further found that Ms. Biggers had proven by a preponderance of the evidence that Isaac's Lounge discriminated against her because of her sex by terminating her employment because she resisted the sexual advances of Mr. Wilson, the owner of the lounge. LIRC Opinion, p. 4.

Ms. Biggers' sexual harassment claim was defined as a *quid pro quo* claim; that is, her refusal to submit to unwanted sexual advances resulted in a detriment to her employment, which in this case was her termination. To prevail on a *quid pro quo* claim, she had the burden of proving (1) she was a member of the protected group; (2) she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon her sex; (4) that her submission to the unwelcome advances was an express or implied condition for receiving job benefits or that her refusal to submit to such advances resulted in a

tangible job detriment; and (5) *respondeat superior*—the employer knew or should have known of the harassment and took no effective remedial action. LIRC Opinion, p. 6. The Commission found that Ms. Biggers met her burden on all elements and held that there was very strong evidence of a causal connection between Ms. Biggers' rejection of Mr. Wilson's sexual advances and her discharge. LIRC Opinion, pp. 6–9. Since Mr. Wilson was the owner of the employer, he was liable without the operation of *respondeat superior*. LIRC Opinion, p. 6.

The Commission ordered Isaac's Lounge to make Ms. Biggers whole for all losses in pay and benefits that she suffered "by paying her the sum of money she would have earned as an employe but for its unlawful act in terminating her employment." LIRC Opinion, p.4. The amount owed Ms. Biggers was to be calculated from the date of the complainant's termination of employment until Isaac's Lounge complied with the order. The sum was subject to an offset of Ms. Biggers' interim earnings, as well as interest at the rate of 12 percent. Isaac's Lounge was also ordered to pay Ms. Biggers' attorney's fees of $1,980.00, plus costs of $47.20.[1]

The decision by the Labor and Industry Review Commission was affirmed by Milwaukee County Circuit Court Judge William J. Haese on March 23, 1994, as being supported by substantial evidence. Wis. Stat. § 227.57(6). Thereafter, the Wisconsin Court of Appeals affirmed the circuit court judgment on April 25, 1995.

Mr. Wilson filed for bankruptcy on December 5, 1996. Ms. Biggers commenced this adversary proceeding on February 19, 1997 and alleges that Mr. Wilson's debt to her is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

## III. ARGUMENTS

Ms. Biggers contends that the issue in the case at hand is the same as the issue involved in the prior proceeding before the Adminis-

---

1. At page 5 of its October 21, 1993, decision, the LIRC states that the complainant is awarded $1,980.00 as attorney's fees and $47 .20 in costs. On pages 11 and 12 of its decision, the LIRC notes that the ALJ awarded $900 and the LIRC awarded additional attorney's fees of $1,100.00 and costs of $27.20. We cannot reconcile the discrepancy.

trative Law Judge and the LIRC. The LIRC issued a final decision, which was upheld by the circuit and appellate courts. Mr. Wilson sexually harassed Ms. Biggers and terminated her employment after she resisted his advances. This conduct, according to Ms. Biggers, is willful and malicious and the findings in the state proceedings are sufficient for summary judgment.

Mr. Wilson contends that the issue in this case is not the same issue in the state proceedings. He states that the LIRC's findings of discrimination were made pursuant to the Fair Employment Act[2] and did not include a finding of willfulness or maliciousness. Consequently, the factual findings by the LIRC are not sufficient for the bankruptcy court to determine that Mr. Wilson's actions were willful and malicious. Mr. Wilson also notes that he was not represented by counsel during the hearings before the Administrative Law Judge, and for collateral estoppel purposes, this does not constitute full representation. Additionally, Mr. Wilson claims that there is a genuine issue regarding the amount of Ms. Biggers' damages.

## IV. ANALYSIS

### A. *Summary Judgment Standards*

The primary purpose for granting summary judgment motions is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *In re Ballantyne,* 166 B.R. 681, 684 (Bankr.E.D.Wis.1994) (citing *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no genuine issue of material fact is in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Summary judgment must be granted when the record, taken as a whole and in a light most favorable to the non-moving party, could not lead a rational trier of fact to find for the non-moving party. *Id.*

### B. *Collateral Estoppel/Issue Preclusion[3] Standards*

The plaintiff argues that this court is bound by the factual findings of the ALJ regarding the defendant's conduct toward the plaintiff, which were affirmed by the LIRC, the state circuit court and the court of appeals, thus invoking the doctrine of issue preclusion. In determining whether issue preclusion applies, this court must look to the law of preclusion in the appropriate state and give state "judicial proceedings" the "same full faith and credit ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738; *see E.B. Harper & Co. v. Nortek, Inc.,* 104 F.3d 913, 921 (7th Cir.1997) (using Oregon law to construe preclusive effect of issue determined by Oregon judgment). Under Wisconsin law, issue preclusion bars relitigation of an issue of ultimate fact previously determined by a final judgment. *Landess v. Schmidt,* 115 Wis.2d 186, 198, 340 N.W.2d 213, 219 (Ct.App.1983). Although there is identity of parties in this case, this factor is not always required. *Lindas v. Cady,* 183 Wis.2d 547, 558, 515 N.W.2d 458, 463 (1994). The issue in the prior action must have been actually litigated by the parties. *Id.* at 559, 515 N.W.2d at 463. Finally, the second pro-

---

**2.** Mr. Wilson also contends that Ms. Biggers erroneously cited Title VII cases as support for her position. According to Mr. Wilson, the standards for finding a violation of Title VII is significantly different from those utilized under Wisconsin's Fair Employment Act. The Wisconsin Supreme Court has concluded, however, that given the identical purposes of WFEA and Title VII, it is appropriate to consider federal decisions. *Marten Transport, Ltd. v. DILHR,* 176 Wis.2d 1012, 1020, 501 N.W.2d 391, 394 (1993); *see also* Wis. Stat. § 111.31(3) (policy to liberally

construe subchapter to accomplish purpose of employment of qualified individuals regardless of sex and other characteristics).

**3.** Our state supreme court adopted the term "claim preclusion" to replace "res judicata" and "issue preclusion" to replace "collateral estoppel." *Northern States Power Co. v. Bugher,* 189 Wis.2d 541, 550, 525 N.W.2d 723, 727 (1995). The respective term will be used in this decision as it is in the cases cited.

ceeding must involve " 'the same bundle of legal principles' that contributed to the disposition of the first legal proceeding." *Landess*, 115 Wis.2d at 198, 340 N.W.2d at 219 (citation omitted). Using the standards set by Wisconsin law, the facts determined by the ALJ would be binding on a state court, and thus on this court, because they were adopted by the LIRC and the state court, the parties were the same, the issues of the defendant's wrongful conduct toward the plaintiff and the causal connection to her damages were actually litigated, and the legal principles applicable to those actions and results contributed to the disposition.

■ The binding effect of action by an administrative agency action is also supported by the Seventh Circuit Court of Appeals in *Meyer v. Rigdon*, 36 F.3d 1375, 1379–80 (7th Cir.1994). That case held that such decisions were entitled to preclusive effect if (1) the original action was properly before the agency, (2) the same disputed issues of fact are before the court as were before the agency, (3) the agency acted in a judicial capacity, and (4) the parties had an adequate opportunity to litigate the issue before the agency. *Id.* at 1379–80.

■ In this case, all four factors apply, including the defendant's opportunity to litigate, which he questioned. The LIRC decision notes that the defendant called nine witnesses on his own behalf, and one third of the transcript is devoted to his cross examination of the plaintiff. LIRC Opinion, p. 11. Thus, it appears that the ALJ's findings of fact would be binding on this court even if they did not have the imprimatur of the state circuit court and court of appeals.

On the other hand, the debtor contends that the doctrine of issue preclusion in the Seventh Circuit requires full representation, and he appeared *pro se* in the administrative proceeding. *See Meyer*, 36 F.3d at 1379. Case law in this circuit establishes four elements of collateral estoppel: (1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4)

the party against whom estoppel is invoked must be fully represented in the prior action. *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir.1990).

Because he was not represented by counsel at the evidentiary hearing before the Administrative Law Judge where the initial findings were made, the debtor contends that the judgment cannot be given preclusive effect. The plaintiff, on the other hand, points out that Mr. Wilson was represented by counsel before the circuit court and before the court of appeals.

The quandry presented by these conflicting Seventh Circuit opinions is obvious. On the one hand, we are directed by *E.B. Harper & Co. v. Nortek, Inc.*, to apply the law of Wisconsin to determine whether to give the ALJ's findings preclusive effect. The findings meet the requirements of Wisconsin law precluding further litigation. On the other hand, *Meyer v. Rigdon* requires that the defendant have been fully represented in the prior proceeding for collateral estoppel to apply. *Meyer*, 36 F.3d at 1379. He was represented only before the state court, not the agency where the findings were made. Under these latter standards, collateral estoppel would not apply.

Obviously, this court cannot apply both directives from the Seventh Circuit, as they are mutually exclusive when applied to the instant case. However, the origins of the fourth element set forth in *La Preferida*, the representation requirement, are unclear, as opposed to the first three elements. This fourth element may be the less compelling directive, particularly in light of Wisconsin's requirement for "fundamental fairness," and representation in the prior proceeding could be one of several considerations in determining whether an issue is binding. Furthermore, the representation requirement does not carry the historical and logical support that the fairness doctrine does. Tracing the history, *Meyer v. Rigdon* lists the four elements of collateral estoppel, citing *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 906 (7th Cir.1990), and *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th

Cir.1987), both of which name the same four elements. *Meyer,* 36 F.3d at 1379. None of these cases discusses the representation requirement, nor does it appear to be dispositive in these cases. *Klingman v. Levinson* cites three cases in support of the four elements of collateral estoppel, but none of those three cases have a requirement that the party against whom the doctrine is sought to be invoked must have been fully represented at the prior proceeding. *See Teamsters Local 282 Pension Trust Fund v. Angelos,* 815 F.2d 452, 456 n. 3 (7th Cir. 1987); *Gilldorn Savs. Ass'n v. Commerce Savs. Ass'n,* 804 F.2d 390, 392 (7th Cir.1986); *Ferrell v. Pierce,* 785 F.2d 1372, 1384–85 (7th Cir.1986).

In the first case cited by the court in *Klingman v. Levinson, Teamsters Local 282 Pension Trust Fund v. Angelos,* 815 F.2d at 456 n. 3, the court described the doctrine of collateral estoppel as properly applied "when an issue raised by a party to a suit has been actually and necessarily litigated in a prior suit and when the party against whom estoppel is asserted has had a 'full and fair opportunity' to litigate the issue." Representation is not specifically mentioned.

In *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n,* 804 F.2d at 392, the standards described are whether "(1) the party against whom the doctrine is asserted was a party to the earlier proceeding; (2) the issue was actually litigated and decided on the merits; (3) the resolution of the particular issue was necessary to the result; and (4) the issues are identical." Again, representation of the party against whom the doctrine was sought to be invoked was not an element of collateral estoppel.

Finally, *Ferrell v. Pierce,* 785 F.2d at 1384–85, likewise, did not require that a party be represented in the prior action, but emphasized the importance of the adversely affected party's motivation to litigate the issue in the first instance. If the party and the trier of fact recognized that the issue was important enough to litigate, and it affected the outcome, then the issue should not be relitigated. *Id.* at 1385.

■ The policy running through these Seventh Circuit cases addressing collateral estoppel is in harmony with the law of issue preclusion in Wisconsin—that the court is required to conduct a "fundamental fairness" analysis. *See Michelle T. v. Crozier,* 173 Wis.2d 681, 687–88, 495 N.W.2d 327, 329–30 (1993). Courts may consider an array of factors in deciding whether issue preclusion is equitable in a particular case:

(1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Id.* at 688–689, 495 N.W.2d at 330–31. The state of Wisconsin does not require "full representation" in the prior action before the doctrine of issue preclusion may be invoked.

There would be nothing unfair about this court using the findings of the LIRC, as they were fully and fairly litigated before the agency, and the sufficiency of the evidence was tested before the circuit court and court of appeals. *See* Wis. Stat. § 227.57(6). Mr. Wilson had ample opportunity to present his side of events and to argue the application of the law. The findings are detailed and necessary to the result. The same conduct is the basis for the plaintiff's cause of action before the agency and in the bankruptcy court. When a litigant has had the opportunity to litigate an issue and loses, it is long standing policy that he may not start over and retry it. *See Ferrell,* 785 F.2d at 1384. It would be a poor use of adjudicative resources to allow an individual to conduct an extensive hearing before an administrative agency without an attorney, proceed through the state court review, and then litigate the

same facts in the bankruptcy court if he did not like the result.

Accordingly, this court will apply the doctrine of issue preclusion and compare the findings in the LIRC's decision with the elements of an 11 U.S.C. § 523(a)(6) cause of action to determine whether the debt should be excepted from the debtor's discharge, or whether further fact finding is necessary.

### C. Willful and Malicious Injury under 11 U.S.C. § 523(a)(6)

Where a debtor's obligation arises from "willful and malicious injury" to another, that debt is nondischargeable under the Bankruptcy Code. 11 U.S.C. § 523(a)(6).[4] In order for the debt to be nondischargeable under § 523(a)(6), Ms. Biggers must prove by a preponderance of the evidence that Mr. Wilson's actions were both "willful and malicious." *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). A "willful" act is one that is deliberate and intentional, and a "malicious" act is one that is wrongful and taken without just cause or excuse, even though without ill will. *Matter of Thirtyacre*, 36 F.3d 697, 700–01 (7th Cir. 1994). The Seventh Circuit has concluded that § 523(a)(6) does not require specific intent to injure in order to prevent discharge. *Id.* at 700–01; *In re Rosenberger*, 208 B.R. 445, 447 (Bankr.C.D.Ill.1997).

In adopting this definition of malice, the Seventh Circuit rejected the stricter standard adopted by some courts which require a specific intent to do harm. However, the court did not expressly determine whether "malice" requires that the act inevitably or necessarily cause injury. *See In re Knapp*, 179 B.R. 106 (Bankr.S.D.Ill.1995) (discussing Seventh Circuit's approach to § 526(a)(6)). Some lower courts addressing the issue subsequent to *Thirtyacre* have nevertheless held that in order to find malice, the act in question must necessarily lead to or be substantially certain to cause harm. *In re Rosenber-*

*ger*, 208 B.R. at 447; *Matter of Staggs*, 177 B.R. 92, 96 (N.D.Ind.1995).

In this instance, Mr. Wilson was found by the LIRC to have violated Wisconsin's Fair Employment Act, which provides the following:

(1) Employment discrimination because of sex includes, but is not limited to, any of the following actions by any employer, labor organization, employment agency, licensing agency or other person:

. . .

(b) Engaging in sexual harassment; or implicitly or explicitly making or permitting acquiescence in or submission to sexual harassment a term of condition or employment or the basis or any part the basis for any employment decision affecting an employe; or permitting sexual harassment to substantially interfere with an employe's work performance or to create an intimidating, hostile or offensive work environment. Under this paragraph, an employer, labor organization, employment agency or licensing agency is presumed liable for an act of sexual harassment by that employer, labor organization, employment agency or licensing agency or by any of its employees or members, if the act occurs while the complaining employe is at his or her place of employment or is performing duties relating to his or her employment, if the complaining employe informs the employer, labor organization, employment agency or licensing agency of the act, and if the employer, labor organization, employment agency or licensing agency fails to take appropriate action within a reasonable time.

Wis. Stat. § 111.36(1)(b) (1990).

The LIRC found that Mr. Wilson subjected Ms. Biggers to unwelcome sexual harassment. LIRC Opinion, p. 8–10. "Sexual harassment" is defined by the Fair Employment Act as

---

**4.** Section 523(a)(6) of the Bankruptcy Code provides:

(a) A discharge under ... this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

unwelcome sexual advances, unwelcome physical contact of a sexual nature or unwelcome verbal or physical conduct of a sexual nature. "Unwelcome verbal or physical conduct of a sexual nature" includes but is not limited to the deliberate, repeated making of unsolicited gestures or comments, or the deliberate, repeated display of offensive sexually graphic materials which is not necessary for business purposes.

Wis. Stat. § 111.32(13) (1990). The Commission also found that Mr. Wilson wrongfully terminated Ms. Biggers' employment in violation of the Fair Employment Act. The LIRC's determination that the termination was wrongful was based on the fact that the only reason for her termination was because she resisted Mr. Wilson's sexual advances. LIRC Opinion, p. 7.

Mr. Wilson's conduct was clearly found by the Commission to be deliberate, *see* Wis. Stat. § 111.32(13), and thus satisfies the willful prong of § 523(a)(6). Undoubtedly, the termination of Ms. Biggers because she refused Mr. Wilson's advances necessarily lead to the harm she suffered—the loss of her job and wages. The Commission found that the termination was wrongful, and it follows that Mr. Wilson's actions were without justification. The LIRC further determined the formula for calculating the amount of Ms. Biggers' wage loss and the dollar amount of attorney's fees to which she was statutorily entitled. Because a specific finding of ill will is not necessary in the Seventh Circuit, the Commission's factual findings describing and characterizing his conduct are enough to satisfy the requirement of malice.

Accordingly, this court concludes that Mr. Wilson's acts were willful in that they were deliberate and intentional and were malicious in that they were wrongful, done in violation of state law, and were without justification. There are no genuine issues of material fact in dispute and summary judgment is appropriate.

This ruling is also consistent with other courts that have held that sexual harassment, even short of the termination of employment

suffered by Ms. Biggers, meets the requirements for the exception to discharge under 11 U.S.C. § 523(a)(6). *See, e.g., In re Miera,* 926 F.2d 741 (8th Cir.1991) (debtor wilfully and maliciously injured an employee by kissing the employee against his will); *In re Gee,* 173 B.R. 189 (9th Cir. BAP 1994) (sex discrimination was willful and malicious); *In re Topakas,* 202 B.R. 850 (Bankr.E.D.Pa.1996), *aff'd,* 1997 WL 158197 (E.D.Pa.1997) (sexual harassment under federal statute by unwanted touching was willful and malicious); *In re Sotelo,* 179 B.R. 214 (Bankr.S.D.Cal.1995) (suggestive comments were sexual harassment and were nondischargeable).

### D. *Damages*

 The Commission ordered Isaac's Lounge make Ms. Biggers whole for all losses in pay and benefits that she suffered "by paying her the sum of money she would have earned as an employe but for its unlawful act in terminating her employment." LIRC Opinion, p. 4. The amount owed Ms. Biggers was to be calculated from the date of the complainant's termination of employment until Isaac's Lounge complied with the order. The sum was subject to an offset of Ms. Biggers' interim earnings, as well as interest at the rate of 12 percent. She states in her reply brief that she had $3,474.88 in interim earnings. Isaac's Lounge was also ordered to pay Ms. Biggers' attorney's fees, although as was stated earlier, there is a discrepancy in the amount. She requests an additional $9,171.30 for fees and costs before the circuit court and court of appeals.[5]

Ms. Biggers filed a wage loss statement, which provided for wages of $7.00 per hour and $3.00 per hour in tips, with an average of 18 hours worked per week. From the date of Ms. Biggers' termination, December 5, 1990, to the approximate date of her adversary complaint, February 14, 1997, Ms. Biggers' wage loss totaled $58,114 .26 and accrued interest is $20,813.27, less her interim earnings of $3,474.88. Because Mr. Wilson has not complied with the LIRC order, damages continue to accrue.

Mr. Wilson contends that the amount of the judgment has never been determined

---

**5.** Affidavit of Attorney M. Nicol Padway dated February 12, 1997.

with certainty because the adversary proceeding was filed before the LIRC made a determination of whether Ms. Biggers diligently mitigated her losses, by how much her claim should be reduced, or whether she has any right to make a claim for wages after the date she was offered reinstatement. According to Mr. Wilson, because Ms. Biggers' damages have not been computed to a sum certain, summary judgment is inappropriate. Ms. Biggers, on the other hand, notes that Mr. Wilson has not presented evidence to counter her calculations of damages or her assertion that she made reasonable efforts to mitigate her damages.

This court need not make that calculation. The administrative agency's decision provided the formula for calculating the damages, and it calculated attorney's fees up to the last point it was requested to do so. If there is a question as to Ms. Biggers' mitigation efforts or earnings, the agency that is familiar with the case is the appropriate forum to determine the amount by which the damages should be reduced, if any. The agency, or the state court, is likewise the appropriate forum to determine the amount of attorney's fees that should be awarded in an action of this type. Since a final, enforceable state court judgment already exists, it is not necessary for this court to further quantify it, and to the extent it has jurisdiction to determine these dollar amounts, this court will abstain from doing so. All that is necessary is a finding that the debt to the plaintiff is excepted from the debtor's discharge. Attorney's fees attributable to a debt excepted from discharge are likewise not discharged. *Klingman v. Levinson,* 831 F.2d 1292, 1296 (7th Cir.1987).

## V. CONCLUSION

For the reasons stated above, the plaintiff's motion for summary judgment is granted. The debtor's conduct was both willful and malicious, and the debtor's liability to the plaintiff is excepted from the debtor's discharge under 11 U.S.C. § 523(a)(6).